UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------------X
ALLSTATE INSURANCE COMPANY,
ALLSTATE INDEMNITY COMPANY,
ALLSTATE PROPERTY & CASUALTY INSURANCE
COMPANY, ALLSTATE NEW JERSEY INSURANCE
COMPANY and ALLSTATE VEHICLE &
PROPERTY INSURANCE COMPANY
(F/K/A DEERBROOK INSURANCE COMPANY),

                Plaintiffs,

                                       Docket No.:_____(__)

vs.

                                       Trial by Jury Demanded

VLADIMIR GRINBERG,
JOHN BRAUN, PH.D.,
DIJANA BLACIC, PSY.D.,
ERNEST BONAPARTE, PH.D.,
KENNETH COCHRANE, PH.D.,
KENNETH DIAMOND, PH.D.,
MICKAELLE DOUGHERTY, PH.D.,
YEVGENIY MARGULIS, PH.D.,
RICHARD MAYS, PH.D.,
FRANCES MENDELSOHN, PH.D.,
WALTER SPEAR, PH.D.,
FIVE BORO PSYCHOLOGICAL SERVICES, P.C.,
ALL BORO PSYCHOLOGICAL SERVICES, P.C.,
FIVE BORO PSYCHOLOGICAL AND LICENSED
MASTER SOCIAL WORK SERVICES, P.L.L.C.,
ULTIMATE PROPERTY MANAGEMENT CORP.
and V.G. HEALTHCARE MANAGEMENT, INC.,

                Defendants.
----------------------------------------------------------------------X

## COMPLAINT

      Plaintiffs, ALLSTATE INSURANCE COMPANY, ALLSTATE INDEMNITY

COMPANY, ALLSTATE PROPERTY & CASUALTY INSURANCE, ALLSTATE NEW

JERSEY INSURANCE COMPANY and ALLSTATE VEHICLE & PROPERTY INSURANCE

COMPANY (F/K/A DEERBROOK INSURANCE COMPANY) (collectively, "Allstate" or

"Plaintiffs"), by and through its counsel, Abrams, Cohen & Associates, as and for the Complaint

against the Defendants, VLADIMIR GRINBERG, JOHN BRAUN, PH.D., DIJANA BLACIC, PSY.D., ERNEST BONAPARTE, PH.D., KENNETH COCHRANE, PH.D., KENNETH DIAMOND, PH.D., MICKAELLE DOUGHERTY, PH.D., YEVGENIY MARGULIS, PH.D., RICHARD MAYS, PH.D., FRANCES MENDELSOHN, PH.D., WALTER SPEAR, PH.D., FIVE BORO PSYCHOLOGICAL SERVICES, P.C. ("Five Boro I"), ALL BORO PSYCHOLOGICAL SERVICES, P.C. ("All Boro"), FIVE BORO PSYCHOLOGICAL AND LICENSED MASTER SOCIAL WORK SERVICES, P.L.L.C. ("Five Boro II"), ULTIMATE PROPERTY MANAGEMENT CORP. and V.G. HEALTHCARE MANAGEMENT, INC., upon information and belief hereby alleges as follows:

## NATURE OF THE ACTION

1.      This action seeks to recover money from and to terminate a fraudulent scheme perpetrated by the Defendants against Allstate, the New York automobile insurance industry, the insurance policy holders and taxpayers of New York State.  The Defendants – psychologists, psychology professional corporations, management corporations and non-psychologist professionals – created a fraudulent scheme to obtain benefits available under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65 et seq.) (collectively referred to as the "No-fault Law" or "No-fault Laws"). Under New York State law (NY CLS Ins § 409), insurance companies are required to investigate such fraudulent insurance activity and to initiate civil actions to recoup fraudulently obtained insurance benefits.

2.      The basis for this Complaint are the Defendants' violations of the federal Racketeer Influenced and Corrupt Organizations (RICO) Act, 18 U.S.C. § 1962(c) and (d), and conduct constituting unjust enrichment and common law fraud.  Pursuant to 28 U.S.C. § 2201,

Allstate also seeks a declaration that the Defendants have no right to pursue payments for claims that have been previously denied and/or have not been paid.

      3.        The Defendants developed a set of relationships for the purpose of fraudulently maximizing billable services to increase profits with minimal regard for patient care. Each Defendant plays an important and essential role in the vast scheme to defraud that is herein alleged. Specifically, the Defendants fit into the following categories:

        i.      Defendants FIVE BORO PSYCHOLOGICAL SERVICES, P.C. ("Five Boro I"), ALL BORO PSYCHOLOGICAL SERVICES, P.C. ("All Boro"), FIVE BORO PSYCHOLOGICAL and LICENSED MASTER SOCIAL WORK SERVICES, P.L.L.C. ("Five Boro II") (collectively, "PC/PLLC Defendants"), consist of New York psychology professional corporations and a professional limited liability company that provide the vehicle through which the other Defendants purportedly render the fraudulent psychological services and bill the insurance companies, including Allstate;

      ii.      Defendant Vladimir Grinberg ("Grinberg" or "Administrative Defendant"), a non-psychologist, oversees the administrative services of the PC/PLLC Defendants and hires and supervises the psychologists.  He oversees the billing procedures and the treatment protocols and sets up the course of treatment that is provided to all patients.  He takes profits as an individual, as well as through ULTIMATE PROPERTY MANAGEMENT CORP., V.G. HEALTHCARE MANAGEMENT, INC. and the PC/PLLC Defendants, all of which he owns and controls;

iii.   Defendant John Braun, Ph.D. ("Braun" or "Owner Defendant"), a psychologist licensed in the State of New York, serves as the nominal owner of the PC/PLLC Defendants but does not exercise domain or control over the PC/PLLC Defendants;

iv.   DIJANA BLACIC, Psy.D. ("Blacic"), ERNEST BONAPARTE, Ph.D. ("Bonaparte"), KENNETH COCHRANE, Ph.D. ("Cochrane"), KENNETH DIAMOND, Ph.D. ("Diamond"), MICKAELLE DOUGHERTY, Ph.D. ("Dougherty"), YEVGENIY MARGULIS, Ph.D. ("Margulis"), RICHARD MAYS, Ph.D. ("Mays"), FRANCES MENDELSOHN, Ph.D. ("Mendelsohn") and WALTER SPEAR, Ph.D. ("Spear") (collectively, the "Independent Contractor Defendants"), are licensed psychologists in the State of New York that provide and bill for psychological services in the name of the PC/PLLC Defendants although they are independent contractors and are not employees of, and have no ownership interest in, the PC/PLLC Defendants;

v.   ULTIMATE PROPERTY MANAGEMENT CORP. ("Ultimate Property") and V.G. HEALTHCARE MANAGEMENT, INC. ("V.G. Healthcare") (collectively, the "Management Defendants"), are management companies now dissolved by proclamation. They were wholly owned by Grinberg and operated as a cover for removing profits from the PC/PLLC Defendants. This was accomplished by allegedly providing and overbilling for a range of services including transcription and billing, and by charging the PC/PLLC Defendants excessive rates and fees for leased office space.

4

4.        Allstate seeks more than $2,300,000.00 dollars that the Defendants stole from Allstate.[1]  Allstate also seeks a declaration that no legal obligation exists for it to reimburse more than $8,000,000.00 dollars in pending fraudulent claims submitted by or through the Defendants. Exhibit "1" contains a summary of the billing and payments and a list of the bills submitted to Allstate by the PC/PLLC Defendants.

5.        As discussed in greater detail below, the Defendants acted fraudulently as follows:  1) the PC/PLLC Defendants submitted bills in their own names for psychological services provided by the Independent Contractor Defendants, which is a violation of both New York State licensing laws and the No-fault regulations; 2) the Administrative Defendant, a non-psychologist, hired and supervised psychologists, although not licensed or qualified to do so, directing them to inflate billing in contravention of New York law; 3) the Defendants ordered or performed psychological services through the PC/PLLC Defendants – to the extent that they performed such services at all – pursuant to a fraudulent, predetermined protocol designed solely to maximize charges to Allstate and other insurers; 4) the PC/PLLC Defendants, under the control of the Administrative Defendant and facilitated by Braun, submitted bills for treatment that was either not performed or improperly performed, and that contained inflated line items in order to defraud Allstate; 5) the Defendants purported to provide psychologically necessary services, when in fact the psychological services were not medically or psychologically necessary but were provided for the sole purpose of billing Allstate and other insurers to gain illegal profits; and, 6) the PC/PLLC Defendants, Grinberg and Braun paid kickbacks for patient referrals.  Specific examples of the billing fraud are contained in the charts annexed as Exhibit "2."

---

[1] This sum does not include payments that Allstate made to the PC/PLLC Defendants in the course of, or as a result of, litigation or arbitration proceedings.

6.        The Defendants created a financial and operational set of relationships that permits all of the Defendants to benefit from the fraudulent service and billing protocols.  The Defendants routinely unbundle psychological services and submit bills for multiple procedures, even though the billing codes do not permit separate reimbursement for the specific psychological services that the PC/PLLC Defendants purportedly provide.  Moreover, the services were rarely medically necessary and frequently not provided. The PC/PLLC Defendants illegally submit bills for the fraudulent psychological services purportedly administered by the Independent Contractor Defendants, although they do not have any right to submit such bills to Allstate or to other New York automobile insurers.  The PC/PLLC Defendants subsequently funnel money to the Administrative Defendant, who then pays a nominal per diem salary to the Independent Contractor Defendants.  This is taken from the payments that the PC/PLLC Defendants had no right to collect in the first place.

7.        The Administrative Defendant, a non-psychologist, provides supervisory services to psychologists for the purpose of carrying out the pre-determined, fraudulent protocol. The Administrative Defendant then provides administrative assistance in the submission of fraudulent bills to Allstate and other insurers.

8.        The fraudulent scheme began more than eight years ago and continues until the present time. As a result of the Defendants' fraudulent activity, Allstate has suffered damages of more than $2,300,000.00 dollars.

## THE PARTIES

*Plaintiffs*

9.      Plaintiff Allstate Insurance Company is an Illinois corporation with its principal place of business in Northbrook, Illinois.  Allstate is authorized to conduct business and to issue automobile insurance policies in the State of New York.

10.      Plaintiff Allstate Indemnity Company is an Illinois corporation with its principal place of business in Northbrook, Illinois.  Allstate is authorized to conduct business and to issue automobile insurance policies in the State of New York.

11.      Plaintiff Allstate Property & Casualty Insurance Company is an Illinois corporation with its principal place of business in Northbrook, Illinois.  Allstate is authorized to conduct business and to issue automobile insurance policies in the State of New York.

12.      Plaintiff Allstate New Jersey Insurance Company is an Illinois corporation with its principal place of business in Bridgewater, New Jersey.  Allstate is authorized to conduct business and to issue automobile insurance policies in the State of New York.

13.      Plaintiff Allstate Vehicle and Property Insurance Company (F/K/A Deerbrook Insurance Company) is an Illinois corporation with its principal place of business in Northbrook, Illinois.  Allstate is authorized to conduct business and to issue automobile insurance policies in the State of New York.

*Defendants*

14.     Defendant Braun is a citizen of, and resides in, Connecticut and has been licensed by the State of New York to practice psychology since September 25, 1995.  Braun is the nominal owner of All Boro, Five Boro I and Five Boro II.

15.     Defendant Five Boro I is a New York psychology professional service corporation with its principal place of business in New York. On or about February 26, 2004, Defendant Five Boro I was incorporated in New York.  Braun purports to be the sole owner of Five Boro I with administrative services provided by Grinberg.

16.     Defendant All Boro is a New York psychology professional service corporation with its principal place of business in New York. On or about September 13, 2005, All Boro incorporated in New York. Braun purports to be the sole owner of All Boro with administrative services provided by Grinberg.

17.     Defendant Five Boro II is a New York psychology professional service limited liability company with its principal place of business in New York. On or about February 5, 2010, Five Boro II was formed in New York. Braun and Grinberg are listed as the co-owners of Five Boro II.

18.     Defendant Grinberg is a citizen of, and resides in, New York. Grinberg provides administrative services to All Boro, Five Boro I and Five Boro II and derives economic benefit from the operation of the PC/PLLC Defendants.  He unofficially owns and controls All Boro and Five Boro I. Grinberg is also listed as a co-owner of Five Boro II and wholly owns the Management Defendants.

19.     On February 29, 2012, Grinberg was indicted in the United States District Court in the Southern District of New York in connection with an elaborate scheme to defraud

No-fault insurance carriers.  In particular, Grinberg was charged with conspiracy to commit health care fraud, conspiracy to commit mail fraud and conspiracy to commit money laundering.

20.      On or about June 28, 2013, Grinberg pled guilty to the following federal crimes:  i) conspiracy to commit health care fraud in violation of Title 18, United States Code, Sections 1347 and 1349 in connection with his ownership and control of All Boro Psychological Services, P.C. and Five Boro Psychological and Licensed Master Social Work Services, PLLC, and ii) conspiracy to commit money laundering in violation of Title 18, United States Code, Section 1956(h).

21.      Defendant Blacic is a citizen of, and resides in, New York and has been licensed by the State of New York to practice psychology since September 13, 2006.  Blacic provides fraudulent psychological services as an independent contractor at Five Boro II.

22.      Defendant Bonaparte is a citizen of, and resides in, New York and has been licensed by the State of New York to practice psychology since June 26, 1992.  Bonaparte provides fraudulent psychological services as an independent contractor at All Boro and Five Boro II.

23.      Defendant Cochrane is a citizen of, and resides in, Florida and has been licensed by the State of New York to practice psychology since January 28, 1988.  Cochrane provided fraudulent psychological services as an independent contractor at All Boro.

24.      Defendant Diamond is a citizen of, and resides in, New York and has been licensed by the State of New York to practice psychology since June 22, 1995.  Diamond provides fraudulent psychological services as an independent contractor at All Boro and Five Boro II.

25.     Defendant Dougherty is a citizen of, and resides in, New Jersey and has been licensed by the State of New York to practice psychology since June 22, 1995. Dougherty provides fraudulent psychological services as an independent contractor at All Boro and Five Boro II.

26.     Defendant Margulis is a citizen of, and resides in, New York and has been licensed by the State of New York to practice psychology since December 23, 1999. Margulis provides fraudulent psychological services as an independent contractor at All Boro and Five Boro II.

27.     Defendant Mays is a citizen of New York, and resides in, and has been licensed by the State of New York to practice psychology since December 23, 1983. Mays provides fraudulent psychological services as an independent contractor at Five Boro I and All Boro.

28.     Defendant Mendelsohn is a citizen of, and resides in, New York and has been licensed by the State of New York to practice psychology since August 31, 1984. Mendelsohn provides fraudulent psychological services as an independent contractor at All Boro and Five Boro II.

29.     Defendant Spear is a citizen of, and resides in, Connecticut and has been licensed by the State of New York to practice psychology since April 6, 1979. Spear provides fraudulent psychological services as an independent contractor at All Boro and Five Boro I.

30.     Defendant V.G. Healthcare was incorporated under the laws of New York State with its principal office located at 5378-5380 Kings Highway, Brooklyn, NY. On or about September 14, 1998, Grinberg incorporated V.G. Healthcare for the purpose of providing transcription, billing and other support services, which he then used to bill the PC/PLLC

Defendants at exorbitant rates. Defendant Grinberg wholly owned and controlled V.G. Healthcare for his exclusive benefit. On or about July 29, 2009, the State of New York caused V.G. Healthcare to be dissolved by proclamation.

31.     Defendant Ultimate Property was incorporated under the laws of New York State with its principal office located at 5378-5380 Kings Highway, Brooklyn, NY.  On or about January 9, 2003, Grinberg incorporated Ultimate Property for the purpose of purchasing real estate which he then used for various business purposes, including leasing real estate at an exorbitant rate to the PC/PLLC Defendants. Defendant Grinberg wholly owned and controlled Ultimate Property for his exclusive benefit. On or about July 27, 2009, U.S. Bank National Association, As Trustee, On Behalf of the Holders of the CSFB Mortgage Pass-Through Certificates, Series 2005-CF1, brought a foreclosure action against Ultimate Property and Grinberg as President of Ultimate Property, which led to its foreclosure. On or about October 28, 2009, the State of New York caused Ultimate Property to be dissolved by proclamation.

## JURISDICTION AND VENUE

32.      This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of seventy-five ($75,000.00) dollars, exclusive of interest and costs. Additionally, the matter involves citizens of different states. Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over the claims brought under 18 U.S.C. § 1961 et seq., also known as the Racketeer Influenced and Corrupt Organizations ("RICO") Act, because the claims arise under the laws of the United States. Additionally, this Court has supplemental jurisdiction over the subject matter of the claims asserted pursuant to 28 U.S.C. § 1367.

33.      Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where one or more of the Defendants reside.  Also, a substantial amount of the activities forming the basis of the Complaint occurred in this District.

## ALLEGATIONS COMMON TO ALL CLAIMS

### *An Overview of the No-fault Laws and Licensing Statutes*

34.      Under New York's No-fault Laws, automobile insurers are required to provide Personal Injury Protection Benefits ("No-fault Benefits") to policyholders and other eligible victims of automobile accidents ("Insured" or "Insureds").  The No-fault Laws provide Insureds with an efficient mechanism to pay for and receive prompt and necessary healthcare services after an automobile accident.

35.      Allstate underwrites automobile insurance in the State of New York.

36.      Insureds may claim No-fault benefits of up to Fifty Thousand ($50,000.00) Dollars for necessary expenses incurred for healthcare goods and services, including psychological services.

37.      Pursuant to a duly executed assignment clause, an Insured may assign the right to No-fault benefits to healthcare service providers in exchange for those services.  Healthcare service providers may then submit claims directly to an insurance company for payment of medical services provided to the Insured. Medical service providers may use the claim form required by the New York State Department of Insurance, known as Form NF-3 or the Verification of Treatment by Attending Physician or Other Provider of Health Service ("NF-3"), or, alternatively, a healthcare provider may use the Health Care Financing Administration insurance claim form, known as the HCFA-1500 form ("HCFA-1500").

38.      Pursuant to the No-fault Laws, only legally incorporated professional corporations may bill for and collect No-fault benefits.   In New York, only a licensed psychologist may: (i) practice psychology; (ii) supervise other psychologists; and (iii) derive economic benefit from psychological services.

39.      Likewise, New York's No-fault Laws and Regulations, Education Law and Business Corporation Law do not permit providers of psychological services to receive No-fault benefits where they use and/or engage in fee-splitting with unlicensed individuals.   The Superintendent of Insurance codified this in the adoption of regulation 11 N.Y.C.R.R. § 65-3.16(a)(12), which states in relevant part:

> A provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York

40.     Providers of psychological services also may not seek to recover No-fault benefits for services not rendered by them or by their employees. Under the No-fault Law, an Independent Contractor is not a "provider" of the medical or psychological services rendered within the meaning of the Insurance Department Regulations. 11 N.Y.C.R.R. § 65-3.11(a) states in relevant part:

> An insurer shall pay benefits for any element of loss, other than death benefits, directly to the applicant or, when appropriate, to the applicant's parent or legal guardian or to any person legally responsible for necessities, or, upon assignment by the applicant or any of the aforementioned persons, shall pay benefits directly to providers of health care services as covered under section five thousand one hundred two (a)(1) of the Insurance Law, or to the applicant's employer for loss of earnings from work as authorized under section five thousand one hundred two(a)(2) of the Insurance Law. Death benefits shall be paid to the estate of the eligible injured person.

41.     Therefore, a provider is not entitled to recover "direct payment" of No-fault Benefits from an insurer for services rendered by an independent contractor.

***The Defendants' Fraudulent Treatment Billing Protocol***

42.     New York State Insurance Law § 403 requires that healthcare providers verify bills ("NF-3's") submitted to an automobile insurer subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

The Defendants blithely ignored this admonition in pursuit of fraudulent profits.

43.     A key aspect of the Defendants' scheme is to justify the services as medically necessary in order to secure payment from the insurers. The PC/PLLC Defendants travel to, and allegedly perform services in, various medical clinics (the "Clinics") that provide the patients.

The first step in the justification process is to claim the medical Clinics referred the patient for treatment.  Whether or not the Clinics' doctors actually find that psychological testing and treatment are necessary, the clinics' staff steer the patients to the PC/PLLC Defendants who, in turn, claim that the Clinics had referred the patients.

44.     Thus, a critical component of the Defendants' scheme involves arrangements between the PC/PLLC Defendants and Clinics that cater to high volumes of ambulatory Insureds. At the Clinics, the Insureds receive a laundry list of professional services from a variety of licensed providers, including the PC/PLLC Defendants.  Though seemingly organized to provide a range of healthcare services to Insureds, these Clinics actually serve as fronts for fraudulent billing and service practices. In addition to providing space and patients to the PC/PLLC Defendants, the Clinics usually provide facilities for one or more medical professional service corporations, dental professional service corporations, chiropractic professional service corporations, physical therapy service corporations and acupuncture professional service corporations.  The PC/PLLC Defendants maintain formal and informal financial and service arrangements with the Clinics that may include office space and personnel sharing agreements. Through such arrangements, which involve excessive fees, the PC/PLLC Defendants gain access to the Insureds who the clinics steer to them.  In essence, the clinics provide a stream of patients to the Defendants in exchange for financial considerations, which act as kickbacks, and are often disguised as service and rental agreements.

45.     Pursuant to New York State Law, medical providers, including psychological health care providers, may not pay kickbacks for their patient referrals.  Kickbacks are prohibited *inter alia* under New York Public Health Law 238-a, which is modeled after the Federal Stark

Law (42 U.S.C. 1395nn) and New York Education Law 8 N.Y.C.R.R.  §§29.1 and 29.12. New York Education Law 8 N.Y.C.R.R. §§29.1 states in relevant part:

§29.1.  General Provisions:

(a)   Unprofessional conduct shall be the conduct prohibited by this section. The provisions of these rules applicable to a particular profession may define additional acts or omissions as unprofessional conduct and may establish exceptions to these general prohibitions.

(b)   Unprofessional conduct in the practice of any profession licensed, certified or registered pursuant to title VIII of the Education Law, except for cases involving those professions licensed, certified or registered pursuant to the provisions of article 131 or 131-B of such law in which a statement of charges of professional misconduct was not served on or before July 26, 1991, the effective date of chapter 606 of the Laws of 1991, shall include:

(1)  willful or grossly negligent failure to comply with substantial provisions of Federal, State or local laws, rules or regulations governing the practice of the profession;

(3)  directly or indirectly offering, giving, soliciting, or receiving or agreeing to receive, any fee or other consideration to or from a third party for the referral of a patient or client or in connection with the performance of professional services;

(4)  permitting any person to share in the fees for professional services, other than: a partner, employee, associate in a professional firm or corporation, professional subcontractor or consultant authorized to practice the same profession, or a legally authorized trainee practicing under the supervision of a licensed practitioner.  This prohibition shall include any arrangement or agreement whereby the amount received in payment for furnishing space, facilities, equipment or personnel services used by a professional licensee constitutes a percentage of, or is otherwise dependent upon, the income or receipts of the licensee from such practice, except as otherwise provided by law with respect to a facility licensed pursuant to article 28 of the Public Health Law or article 13 of the Mental Hygiene Law;

(5)  conduct in the practice of a profession which evidences moral unfitness to practice the profession;

(6)  willfully making or filing a false report, or failing to file a report required by law or by the Education Department, or willfully impeding or obstructing such filing, or inducing another person to do so;

16

46.     In exchange for the kickbacks the Clinics automatically refer Insureds to the PC/PLLC Defendants, with little regard for medical or psychological necessity of the services. The referrals take place even when the insureds' symptoms and presentation, as reflected in the records, provide absolutely no evidence of psychological problems arising out of the accident. The Defendants then engage their pre-determined, fraudulent testing and treatment protocol to maximize billing opportunities.   The Insureds receive virtually identical "evaluations," "diagnoses" and "treatment," and the Defendants use the same billing codes for virtually every Insured.

47.     As further justification by the Defendants for providing the pre-determined, fraudulent protocol, the Insureds receive a Self-Referral Consent Form (the "Self-Referral Form"). At the bottom of the Self-Referral Form it provides:

> New York State Insurance Law: Under New York State No-fault Law [sic], a claimant can self-refer for a psychological evaluation and the medical necessity of an evaluation of consultation is determined by the claimant self reported emotional and cognitive symptomatology as stated in the above Patient Authorization and consent form.

48.     The Self-Referral Form contains a list of problems and conditions that the Insured may circle if he or she experiences any symptoms.   The Defendants then use the supposedly circled items by the Insured as further justification for the fraudulent protocol of psychological services.

49.     Along with the Self-Referral Form, before seeing a psychologist, every Insured receives five (5) specific "tests," which are actually "checklists" or "inventories," that the Insured usually completes in twenty minutes or less and for which the PC/PLLC Defendants bill for five hours of service.   The Insured then meets with either the Owner Defendant or an Independent Contractor Defendant (individually, "Psychologist Defendant," collectively,

"Psychologist Defendants") for a minimal amount of time, usually between five to fifteen minutes, during which they purport to provide a "Diagnostic Interview Examination." With rare exceptions, the documents submitted by the Defendants to Allstate reflect the following pattern of services, along with the same pattern of corresponding billing for virtually every Insured:

- Clinics "refer" Insureds to the Defendants for psychological evaluation; before meeting with a psychologist, a clerical assistant provides the insureds with the Self-Referral Form, along with the same five specific "tests." The Defendants bill for five hours of services under billing code 96101 for the administering, scoring and interpretation of the "tests";

- Defendants claim to evaluate medical and psychological records, for which they bill one hour of time under billing code 90885; the Insureds supposedly meet once, for a nominal period of time, with an Owner Defendant or Independent Contractor Defendant, who bills for one hour under billing code 90801 for the "Diagnostic Interview Examination";

- The Owner Defendant or Independent Contractor Defendant provides one of two diagnoses and recommends brief outpatient psychotherapy for virtually every Insured; Defendants bill under billing code 90887 for allegedly interpreting or explaining results to family members or a responsible person on how best to assist the patient;

- Defendants then submit a range of documents to Allstate in the name of the PC/PLLC Defendant who purportedly provided the psychological services, requesting reimbursement under billing codes 96101 (five hours),

18

90885 (one hour), 90801 (one hour), and 90887 (one hour), for a total of eight hours per patient of billable time.

50.     In some cases, the Insured returns for one or two follow-up appointments that almost always last less than twenty minutes which the Defendants bill under 90806, the code for individual psychotherapy sessions lasting forty five to fifty minutes.

51.     Each step in the pre-determined psychological service protocol results in fraudulent billing by the Defendants through a pattern of material misrepresentations of what precipitated the treatment and actually occurred with each Insured.

52.     The Defendants deliberately designed and continue to participate in the pre-determined, fraudulent protocol to bill Allstate and other insurers. Additionally, the Defendants use the protocol to provide a set of pre-meditated rationales for the bills submitted to Allstate, where each previous step provides a false justification for the subsequent step.

### The Fraudulent "Psychological Testing" Charges

53.     Upon entering the facility used by the PC/PLLC Defendant and prior to seeing a psychologist, the Insureds receive a set of five "tests" to complete.  This packet of tests includes:

Beck Hopelessness Scale® (BHS®);

Beck Anxiety Inventory® (BAI®);

Beck Depression Inventory®—II (BDI®—II);

Pain Patient Profile (P-3®); and

Posttraumatic Stress Diagnostic (PDS®).

54.     The Insureds complete these "checklists" or "inventories" (the "Inventories")
within a very short period of time, usually about ten minutes.  The Defendants bill one hour for
administering and scoring each of the five Inventories under billing code 96101 at a rate of
$139.30 per hour, resulting in a charge of $696.55 per Insured.[2]

55.     When billing code 96101 is utilized properly, it provides a way for
psychologists and physicians to bill in units of one hour for face-to-face time for administering
psychological tests to patients with built-in time for interpreting the tests and preparing the
reports.

56.      In fact, the Inventories do not fall into the category of psychological testing for
which billing code 96101 was designed to be used, but constitute pre-printed "checklists" handed
to the Insured by a clerical assistant prior to the Insured's ever seeing a psychologist.   The
Insureds merely place check-marks next to the psychological symptoms they purport to be
experiencing and a psychologist or an assistant performs a simple tally of the score.  If conducted
correctly, the Inventories require little or no interpretation and provide the practitioner with basic
information about a patient.  In the New York Workers' Compensation, Medical Fee Schedule,
billing code 96101 actually lists examples of tests included under the code – MMPI, Rorschach,
and WAIS. Unlike the inventories, these tests require a large amount of time to administer and
require a trained practitioner with a high degree of technical expertise to interpret.

57.     The Defendants acted fraudulently in misrepresenting the amount of time they
took in administering, evaluating and reporting on the Inventories.  For virtually every Insured,
the Psychologist Defendants claim that the total time for administering, interpreting and
reporting on the Inventories takes five hours to complete.  In actuality, all five Inventories take
less than one hour to complete.   The Defendants deliberately inflate the billing for the

---

[2] Prior to January1, 2006, the CPT billing code designated for psychological testing services was 96100.

Inventories by providing a separate code for each one, even though billing code 96101 should not be billed for each Inventory, but should be billed for the time it takes for a psychologist to provide the complete service.  In short, the Defendants administer the Inventories to virtually every Insured pursuant to the pre-determined, fraudulent protocol, so that they can purposefully maximize the fraudulent charges which they then submit, or caused to be submitted, to Allstate.

58.      In addition to the fraudulent charges for the Inventories, the Defendants virtually always submit a separate charge of $103.31 under billing code 90887 for the "interpretation or explanation of results" to a family member or other responsible persons. However, neither the Defendants nor any individual associated with the PC/PLLC Defendants ever interpret or explain the test results to such persons. Billing code 90887 should be used only when a psychologist must speak with family members or responsible persons of children or incompetent individuals.  In virtually all cases, the Defendant Psychologists do not treat Insureds who fall into the category of an infant or incompetent person so explanations to guardians or other responsible persons are not required. In virtually every case, no interpretation or explanation of results is actually provided to family members or other responsible persons.  The Defendants misrepresent that they provide a service under billing code 90887, serving their true goal of maximizing the amount billed to Allstate and other insurers.

59.      The Defendants use nearly identical language in the reports to Allstate for virtually all the Insureds seen by the PC/PLLC Defendants.  Unique biographical information about the individual Insureds changes only slightly, along with a range of scores derived from the Inventories, which often contains internal contradictions and conflicts that do not make psychological sense considering the Insureds' accident profiles.  In virtually every case, the Defendants use a template that fails to provide a medical or psychological history, any

information about the automobile accident and any detailed information about the treatment provided to the Insureds.

**The Fraudulent "Record Review" and "Diagnostic Interview Examination"**

60.    After completing the Self-Referral Form and the Inventories**,** every Insured purportedly receives an initial "Diagnostic Interview Examination."

61.    The Defendants bill Allstate a total of $194.58 for the "Diagnostic Interview Examination" under billing code 90801.  This bill is separate and independent of the bills for the other psychological services that the Insureds purportedly receive.

62.    The Defendants include the "Diagnostic Interview Examination" as part of their overall fraudulent protocol.  In fact, the "Diagnostic Interview Examination" is medically and psychologically unnecessary, but is included in the testing/treatment protocol in order to add an additional hour of billing and to provide further justification for the other services.  Virtually no patient receiving a "Diagnostic Interview Examination" makes the requisite psychological complaints arising from an automobile accident that would indicate the need for such psychological services.

63.    The Defendants justify the "Diagnostic Interview Examination" by reference to the Self-Referral Form and the primary specialist who made the initial referral to the PC/PLLC Defendant.  For virtually every Insured, the Defendants insert the following statements into the Narrative Report:

> Patient was given a psychosocial symptom checklist by his primary specialist and responded to symptoms of a psychosocial nature that he states were not present before the injury: (Please refer to attached symptom checklist with patient's consent signature for evaluation to be performed regarding causal relationship between accident and onset of symptoms as well as reason for selection of psychometric instruments *vis a vis* the symptoms reported).  Under NYS No Fault Law, a claimant can self refer for a psychological evaluation and the medical

necessity of an evaluation or consultation is determined by the claimant's self reported emotional and cognitive symptomatology as stated in the above "Patient Authorization and Consent Form".) [sic]

Initial Examination performed by primary doctor also revealed that the patient experiences distress related to the accident.  There appears to be limitations in [Name of Insured] functioning and they may be adversely affecting his psychological and emotional well being.  Therefore, the primary physician requested additional psychological information on this patient to provide more appropriate care.  The purpose of this evaluation was to target a differential diagnosis and to design a treatment intervention regimen if there is an indication for further care.

64.     Notwithstanding the statements by the Defendants, in most cases, the Insured does not make complaints to the primary physician, as evidenced in the medical records.  Also, in virtually every case, the Self-Referral Forms do not comport with the results of the Inventories and the "Diagnostic Interview Examination."  The Defendants purposefully manipulate the information from these sources, when in actuality the information neither supports the diagnoses made nor the treatment recommendations prescribed by the Defendants.

65.     Even where the results of the Self-Referral Forms, Inventories, and "Diagnostic Examination Interview" do not support a diagnosis of psychological disorder, the Defendants assign virtually every Insured with a pre-determined, boilerplate "diagnosis."  In order to shoehorn a diagnosis into the insureds' medical history, which includes a recent automobile accident, the Defendant Psychologists use either "posttraumatic stress disorder" ("PTSD") or "adjustment disorder" with or without "depressed mood," "anxious mood" and/or "anxiety."  Moreover, none of the self-referrals, which are on the PC/PLLC Defendants' letterhead, are completed with the assistance of a psychologist but merely contain a checklist of "symptoms" that the lay patient completes and which the Defendants use to justify the services. The Defendants claim that the diagnoses of the Insureds result from the automobile accident they experienced, regardless of their individual characteristics and the distinct presentation.  However,

few, if any, of the Insureds suffered from the diagnosed disorders or from any psychological issues resulting from the alleged automobile accidents.

66.     The Diagnostic and Statistical Manual of Mental Disorders, 4th Edition (the "DSM-IV"), published by the American Psychiatric Association, provides the standard criteria for classification of mental disorders. Like all diagnoses, a diagnosis of PTSD requires a specific set of criteria as defined in the DSM-IV that must be present for such a diagnosis to apply. Specifically, PTSD requires that the patient "experienced, witnessed, or was confronted with an event or events that involved actual or threatened death or serious injury, or a threat to the physical integrity of the self or others." Additionally, a diagnosis of PTSD requires that the person's response "involved intense fear, helplessness, or horror."

67.     Similarly, a diagnosis of "adjustment disorder" requires a specific set of criteria, including the "development of emotional or behavioral symptoms in response to an identifiable stressor(s) occurring within three months of the onset of the stressor(s)." Also, the diagnosis requires that the patient exhibit, "marked distress that is in excess of what would be expected from exposure to the stressor" or "significant impairment in social or occupational (academic) functioning."

68.     The use of "depressed mood," as a sub specification of an "adjustment disorder" means that the person must manifest symptoms such as feelings of hopelessness, tearfulness, or depressed mood. The use of the "anxiety" sub specification means that the person must experience symptoms of jitteriness, nervousness, or worry.

69.     The Insureds who receive evaluation and treatment from the Defendants are nearly always involved very minor automobile accidents, such as side-swipes and low speed, rear-end collisions. Moreover, most of the Insureds did not visit any hospital following the

alleged accidents.  Even in cases where the Insureds did visit a hospital, they only spent short periods of time under observation, a few hours at most, at which point the hospital would release them. Minor accidents of this sort do not cause the concomitant mental conditions that would lead to a diagnosis of "adjustment disorder," or for that matter PTSD, a condition associated with exposure to a traumatic event. By definition, the "fender benders" experienced by the Insureds do not rise to the level of a traumatic event.

70.     The purported diagnoses justify, after the fact, the Inventories and other psychological services that the Defendants stack in order to maximize the fraudulent billable services.  Further, the Defendants then "prescribe" brief outpatient psychotherapy to all the patients, even though they often do not communicate to the Insureds that psychotherapy is prescribed or provide diagnoses.  The Insureds provide a convenient vehicle for the Defendants to front end billing submitted to Allstate and other insurers, with no further intention of actually seeing the Insureds for anything more than brief follow up treatment, if that.  The Defendants have little to no interest in treating the Insureds after the initial pre-determined protocol of services.  This is because they cannot stack the billable time within a single hour like they can do with the initial "testing" and "evaluation."  Even brief psychotherapy sessions require dedicated time and visits with the Insured, which can only be charged once under billing code 90806 without the possibility of charging for additional codes during the time.  The Defendants stack the billing codes into the shortest amount of time possible, so that they can increase revenues by submitting, or causing to be submitted, fraudulent bills to Allstate without actually taking the time to provide patient care.

71.     To increase the amount of billing submitted to Allstate and other insurers, the Defendants submit or cause to be submitted additional billing for services included within other

billing codes.  In other words, in their attempt to fraudulently bill for services, the Defendants unbundle the individual services that they should include under a single billable code, submitting or causing to be submitted multiple billing codes where only one code suffices for the purpose of the psychological service.  By way of example, with virtually every Insured, the Defendants submit separate charges of $67.24 under billing code 90885 for "psychiatric evaluation of hospital records, other psychiatric reports, psychometric and/or projective test, and other accumulated data for medical diagnostic purposes."  The "Diagnostic Interview Examination" under billing code 90801 already reimburses for the services rendered under billing code 90885. Importantly, a healthcare provider must review medical and psychiatric records as part of any "Diagnostic Interview Examination." Billing for the "Diagnostic Interview Examination" and then separately billing for the medical or psychological record review, amounts to double billing for services that are required to be covered by only one billing code.

72.     Additionally, the Defendants acted fraudulently by claiming that the review of the records constituted a substantive, billable event pursuant to billing code 90885.  In fact, the review, if conducted at all, included a review of only a few records that would take only minutes, at most, for the Defendants to complete.  As evidence of their neglect to even conduct the review, in virtually every case, the Defendants fail to even include a description of the automobile accident that led to the Insured's consulting with the Defendants in the first place. Moreover, the Defendants fail to provide any psychiatric, psychological or family history, among other crucial information that the Defendants should have obtained from any medical or psychiatric review of records, or, for that matter from the "Diagnostic Interview Examination," indicating that they never conducted such a review in the first place.

*The Fraudulent Follow-Up "Psychotherapy" Charges*

73.     While the psychological services usually end after the initial visit, in some cases the Defendants do conduct subsequent sessions with the Insureds for individual psychotherapy.   The follow-up sessions that the Defendants claim to conduct are billed to Allstate under billing code 90806, resulting in a charge of $120.10 per Insured for each session.

74.     Under the New York Workers' Compensation, Medical Fee Schedule, billing code 90806 dictates that each session should last "approximately 45 to 50 minutes face-to-face with the patient."   In fact, the Defendants materially misrepresent the level of services provided to the Insureds in these follow up sessions**,** if, in fact, they occur at all.   The Psychologist Defendants virtually never spend the requisite amount of time with the Insured for the follow up psychotherapy sessions.   Instead, the sessions with the Insureds do not last more than twenty minutes.

75.     Knowing that the Insureds do not suffer from a psychological disorder that resulted from an automobile accident, the Defendant Psychologists never actually intend to provide comprehensive psychotherapy to the Insureds. As a matter of fact, the Defendants fail to provide any substantive treatment to the few Insureds that do return for a session or two. Consistent with their true goal of maximizing their billing to Allstate and to other insurers, with minimal concern for the welfare of the Insureds, the Defendants never provide the patients with tools to deal or cope with the diagnoses the Defendant Psychologists initially provided.

76.     According to letters the Defendants claim to send to the Insureds, the "Integrative Psychotherapy is a short-term treatment (3-12 sessions) which employs various therapeutic interventions for the purpose of improving the debilitating impact of situational and adjustment stress, anxiety and depression, and the psychological emotion accompaniments of

pain distress."   However, in the few cases where the Defendants actually conduct follow up sessions, they rarely, if ever, report performing more than one or two sessions. Additionally, according to the Defendants, the "Components of Integrative Psychotherapy" include a "supportive/expressive component," a "psychoeducational component," a "cognitive therapy component," a "behavioral, desensitization component," a "relaxation therapeutic component," and a "visualization and imagery therapeutic component."   Training and instruction in the above areas requires a dedicated time commitment with a patient.  The PC/PLLC Defendants cannot possibly achieve these "Components of Integrative Psychotherapy" within the time they claim to spend performing psychotherapy, if they perform it at all.

77.     The limited time spent with the Insureds, along with the insignificant interactions during the follow up sessions, does not provide any added benefit to the Insureds who would require such treatment, if they actually did suffer from the diagnosed disorders. Since the Defendants' goal is to use the Insureds as a medium to bill for eight hours of treatment on the first day of service, they have no intention of providing more than minimal service after the first day.

### *The Fraudulent NF-3 Forms Submitted to Allstate*

78.     In support of the fraudulent psychology charges, the Defendants submit to Allstate through the US Postal Service, statutorily prescribed claim forms for No-fault Benefits, known as NF-3 Forms.  Since 2004, and up to the present, the Defendants sought payment for ineligible services that the PC/PLLC Defendants claim as payable.

79.     In the NF-3 Forms, the Defendants make materially false representations, misleading Allstate and other insurers, by uniformly misrepresenting that employees or owners provide the psychological services. In fact, in most instances, the PC/PLLC Defendants bill

Allstate directly for services provided by the Independent Contractor Defendants in violation of the New York State Insurance Department regulations, including 11 N.Y.C.R.R. § 65-3.11(a), which does not permit the payment of services where an independent contractor renders the service rather than an employee or owner.

80.     Additionally, the NF-3 Forms uniformly misrepresented to Allstate that the relevant psychological services reflect discreet, billable services, when in fact the services were improperly unbundled, were not medically or psychologically necessary and, in many cases, were not performed at all.

81.     Representative samples of the bills submitted by All Boro, Five Boro I and Five Boro II submitted to Allstate through the US Postal Service are annexed hereto collectively as Exhibit "3."

***Numerous Defendants Have Admitted To Various Aspects of the Fraud***

82.     Vladimir Grinberg admitted that he had committed No-fault fraud; he has pled guilty in the Southern District of New York to medical fraud and money laundering charges in connection with Five Boro Psychological Services and All Boro Psychological Services. During his Plea Allocution, conducted on June 28, 2013, Grinberg admitted that the Defendants billed for medically unnecessary services: "We billed insurance providers for those services under New York State No-fault insurance law. As a part of my business, we billed insurance companies for some unnecessary medical services. I intended to defraud insurance companies in this matter." Grinberg further admitted to making kickback payments in exchange for patients:

> *The Defendant:  When I receipt [sic] for unnecessary services arrived from insurance companies, I cash them [sic] checks at check cashing*
>
> *The Court: Check Cashing?*

*The Defendant: Yeah. And I use the cash to pay for referrals*

*The Court: Pay for referrals?*

*The Defendant: Yes*

*The Court: When you did these acts, did you understand what you were doing was unlawful?*

*The Defendant: Yes.*

See Exhibit "4," p. 16, lines 10-21  plea allocution held before Hon. J. Paul Oetken, District Judge, New York, New York on June 28, 2013 in United States v. Vladimir Grinberg, S14 12 CR 171 (JPO).

83.     Defendant Richard Mays worked for All Boro and Five Boro I for twenty six months starting in 2005.  He swore in his September 17, 2012 affidavit that during his initial interview with Defendant Braun, he was instructed that all patients were to receive the exact same "package of services."  The tests were nearly always administered and scored by a "para-professional assistant" rather than by a licensed psychologist.  The tests took no more than one hour to administer and score, although All Boro and Five Boro I billed for five hours of services. The tests were administered prior to the diagnostic interview, which is not the standard of care. Mays never discussed the results with the patient or the patient's family even though All Boro and Five Boro I billed for this service.  He also never reviewed the patient's medical records before providing psychological services, although both All Boro and Five Boro I also charged for this service.

84.     Defendant Kenneth Diamond worked for All Boro and Five Boro I for approximately nineteenth months starting in 2010.   In his September 21, 2012 affidavit, Diamond admitted that he had no role in conducting or interpreting the psychological tests billed for, which were apparently performed by an unlicensed assistant.   The tests could not have taken more than an hour to administer and score, yet All Boro and Five Boro I billed five hours for these tests.  Diamond also did not discuss the test results with the patients or their families, yet

both All Boro and Five Boro I billed for this service.  Finally, Diamond also routinely signed treatment reports although he did not prepare them, supervise their preparation or, in most cases, compare them with his treatment notes.

85.     Defendant Walter Spear worked for All Boro I for approximately eight months starting in 2007.  In his September 26, 2012 affidavit, he stated that Grinberg and Braun instructed him to refer every patient for psychological testing without regard to their individual circumstances.  He acknowledged that most of the patients were involved in low-impact fender benders and that there was no medical necessity for any psychological testing or treatment. To the extent that the patients manifested psychological symptoms, these would resolve without psychological treatment.  He did not administer or interpret the tests, which were performed by an unlicensed assistant.  The tests took no more than an hour to perform and score, although All Boro I billed five hours for these tests.  All Boro I also billed for Spear's interviews with the patient or the patient's family to discuss the results of the tests and for his review of the patient's medical records before providing psychological services, even though he never performed either.

86.     Defendant Dijana Blacic worked for Five Boro II for eighteen months starting in 2010.  In her September 28, 2012 affidavit, she admitted that most of the patients were involved in low impact accidents and did not require psychological treatment.  Nevertheless, every patient received an identical package of psychological tests.  She had no actual role in performing or interpreting the tests, which were administered and scored by a lay assistant, not by a licensed psychologist.  In most cases, Blacic did not discuss the results of the tests with the patient or the patient's family, even though Five Boro II routinely billed for this service.

31

*The Defendants' Patients Also Attest to the Fraud*

87.     AM testified during his examination under oath ("EUO") that he was not experiencing mental or emotional problems as a result of his automobile accident.  Although he told the medical doctor that he felt nervous and frustrated after the accident, he declined psychological services and did not have any discussions about his emotions with anyone at the clinic.  Nonetheless, Five Boro II billed on behalf of AM for five hours of psychological testing, for a psychiatric evaluation of records, for a psychiatric diagnostic interview and for a one hour session to provide an explanation and interpretation of the test results to the insured's family.

88.     Five Boro II billed for the same eight-hour package of the testing and services for MGS, who testified at his EUO that he only had a ten minute conversation about his feelings with someone and that he completed some forms for about fifteen minutes.  He stated that he felt "normal" and received no reports.  Additionally, no one spoke to him or to his family about the tests.

89.     FB also testified at his EUO that he did not meet with a psychologist at the clinic and that no one at the clinic discussed psychological symptoms with him.  Nevertheless, Five Boro II billed for the complete package of testing and services for FB.

90.     All Boro billed for testing and services for AN, although he also denied in his EUO that he ever met with a psychologist at the clinic or with anyone who addressed his mental or emotional state with him.

91.     All Boro also billed for a complete package of services for GB, who testified at his EUO that he did not request to meet with a psychologist at the clinic.  However, on one occasion he did meet for "a couple of minutes" with a psychologist but he did not complete any questionnaires for the psychologist and was not provided with a copy of any written materials.

92.     DW denied during her EUO that she had any psychological treatment even though All Boro billed for such services.  DW testified that she did not meet with a psychologist, that she did not discuss her feelings or emotions with anybody at the clinic, that she did not request to meet with a psychologist and that she did not make any complaints about her mental health at the clinic.

93.     DS also denied during his EUO that he had ever met with a psychologist at the clinic or had discussed his feelings or emotions with anybody.  DS did not experience any mental or emotional problems after the accident and was not given any written reports.  Nonetheless, All Boro billed for the complete battery of tests and services for DS.

94.     All Boro billed for a complete testing package and for multiple treatment sessions for BM who met briefly with a psychologist on two occasions.  However, BM denied in her EUO that she had any psychological problems or requested psychological treatment. She testified that she did not want to meet with a psychologist and that she had no history of mental illness.  She never complained to anyone at the Clinic that she experienced sadness, depression, anxiety, suicidal thoughts, flashbacks to the accident, insomnia, stress, anger, moodiness, fatigue, lack of motivation, that she was functioning poorly at school or was not able to get along with family members. She filled out a questionnaire for about fifteen minutes before seeing the psychologist.  No one told her that the questionnaire was a test.  The psychologist did not give her the results of the tests and the psychologist never met with any members of her family.  The psychologist did not provide her with a diagnosis or a treatment plan and did not give her a copy of any reports.

95.     During his EUO, KP denied that he suffered the symptoms described on the psychologist's report, including increased crying, dizziness and flashbacks to the scene of the

accident and depression. He did not request to have a meeting with a psychologist but was instructed that he had to meet with the psychologist from All Boro. He spent at most fifteen minutes with the psychologist and denied that he made any mental or emotional complaints. He also denied that he was presented with the form titled "Recommendations for Patient," which was addressed to him.

### The Defendant's Fraudulent Concealment and Allstate's Justifiable Reliance

96.     The legal and ethical obligations of the Defendants require that they act with honesty and integrity in its representations and in its submission of billing to Allstate.

97.     To induce Allstate to pay the inflated charges for the fraudulent psychological services, the Defendants purposefully concealed their fraud, going to great lengths to hide their activities from Allstate and other insurance providers. Specifically, the Defendants submitted or caused to be submitted bills that uniformly misrepresented that the independent contractors who provided psychological services through the PC/PLLC Defendants were their employees, making the PC/PLLC Defendants eligible to bill for and collect No-fault Benefits, when in fact they were not.

98.     Moreover, the Defendants used the billing codes to maximize billable time, fraudulently classifying services in such a way as to increase billable hours, although the Defendants used the billing codes deceptively for the sole purpose of increasing their revenues.

99.      Additionally, the Defendants created fraudulent verifications, or caused them to be created, in the context of ongoing litigation for complaints and other materials in order to provide not only justification but legitimacy in pursuing their fraudulent ends in the courts.

100.     The Defendants also knowingly misrepresented and concealed facts so as to prevent Allstate from discovering that the psychological services were not medically or

psychologically necessary.  Moreover, the Defendants used a pre-determined fraudulent protocol designed to maximize billable charges without any regard for patient care.

101.    The Defendants used a number of professional business entities in order to hide their fraudulent activities behind different tax identification numbers, so that Allstate could not discern billing and practice patterns inherent in the protocol they adopted for their fraudulent ends.

102.     With the statutory and contractual obligations that Allstate must meet in promptly and fairly processing claims within thirty days, Allstate must process claims quickly and efficiently. The Defendants utilized facially valid documents submitted to Allstate that made material misrepresentations, along with pursuing litigation in the court system to further their cause of obtaining fraudulent payments, which all caused Allstate to rely upon the representations, even though false. As a result, Allstate incurred damage of more than $2,300,000.00 based upon the fraudulent charges representing payments made by Allstate on or after 2004.

103.    Due to the material misrepresentations and additional acts to conceal the Defendants' fraud from Allstate, Allstate did not discover, and could not reasonably have discovered, the fraud or recognized the damages caused by it until well after most of the bills at issue were submitted.

104.    Allstate reasonably relied upon the representations made by the Defendant PC/PLLCs in their bills and reports, thereby inducing Allstate to make numerous payments to the Defendant PC/PLLCs.

## FIRST CAUSE OF ACTION

Against the PC/PLLC Defendants

(Declaratory Relief under 28 U.S.C. §§ 2201 and 2202)

105.     Allstate incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 104 above.

106.     There is an actual case and controversy between Allstate and the PC/PLLC Defendants regarding more than $8,000,000.00 in pending fraudulent billing submitted through the PC/PLLC Defendants.

107.     The PC/PLLC Defendants have no right to receive payment for any pending bills submitted to Allstate because the psychological services that are billed through the PC/PLLC Defendants are not medically or psychologically necessary, and are performed - to the extent that they were performed at all - pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants.

108.     The PC/PLLC Defendants have no right to receive payment for any pending bills submitted to Allstate because the psychological services that are billed through the PC/PLLC Defendants in many cases are not provided in the first instance.

109.     The PC/PLLC Defendants have no right to receive payment for any pending bills submitted to Allstate because the psychological services that are billed through the PC/PLLC Defendants are performed - to the extent that they are performed at all - pursuant to illegal kickback arrangements between the Defendants and the Clinics.

110.     To the extent that the billed-for services were purportedly performed by psychologists other than Braun, the PC/PLLC Defendants have no right to receive payment for

any pending bills submitted to Allstate because the billed-for services are performed by independent contractors, rather than by the PC/PLLC Defendants' employees.

111.     Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that:

> a)     Five Boro Psychological Services, P.C., All Boro Psychological Services, P.C. and Five Boro Psychological and Licensed Master Social Work Services P.L.L.C. have no right to receive payment for any pending bills submitted to Allstate because the psychological services that are billed through the PC/PLLC Defendants are not medically or psychologically necessary, and are performed- to the extent that they are performed at all - pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants;

> b)     Five Boro Psychological Services, P.C., All Boro Psychological Services, P.C. and Five Boro Psychological and Licensed Master Social Work Services P.L.L.C. have no right to receive payment for any pending bills submitted to Allstate because, in many cases, the psychological services that are billed through the PC/PLLC Defendants are not provided in the first instance;

> c)     Five Boro Psychological Services, P.C., All Boro Psychological Services, P.C. and Five Boro Psychological and Licensed Master Social Work Services P.L.L.C. have no right to receive payment for any pending bills submitted to Allstate because the psychological services that are billed through the PC/PLLC Defendants are performed - to the extent that they are performed at all - pursuant to illegal kickback arrangements between the Defendants and the referring healthcare clinics; and to the extent that the billed-for services purport to have been performed by anyone other than Braun, Five Boro Psychological Services, P.C., All Boro Psychological Services, P.C., and Five Boro Psychological and Licensed Master Social Work Services P.L.L.C. have no right to receive payment for any pending bills submitted to Allstate because the billed-for services are performed by independent contractors.

## SECOND CAUSE OF ACTION

Against the Management Defendants, Braun and Grinberg

(Violation of RICO, 18 U.S.C. § 1962(c))

112.     Allstate incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 111 above.

113.     Five Boro Psychological Services, P.C. ("Five Boro I") is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affects interstate commerce.

114.     The Management Defendants, Grinberg and Braun have knowingly conducted and/or participated, in  Five Boro I's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341.  They have used the United States mails to submit, or cause to be submitted, thousands of fraudulent bills on a continuous basis for more than eight years seeking payments that Five Boro I was not eligible to receive under the No-fault Laws because the billed-for services were not medically necessary, were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants, were performed pursuant to kickbacks provided to the Clinics, and in many cases were not performed at all. A representative sample of the fraudulent bills and corresponding mailings submitted to Allstate that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2."

115.     Five Boro I's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers.  The predicate acts of mail fraud are the regular way in which Grinberg and Braun operate Five Boro I, insofar as Five Boro I is not engaged in a legitimate psychological practice, and acts of mail fraud therefore are essential in order for Five Boro I to function.  Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through Five Boro I to the present day.

116.     Five Boro I is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to Allstate and other insurers. These inherently unlawful acts are taken by Five Boro I in pursuit of inherently unlawful goals - namely, the theft of money from Allstate and other insurers through fraudulent No-fault billing.

117.     Allstate has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,600,000.00 pursuant to the fraudulent bills submitted by the Defendants through Five Boro I.

118.      By reason of its injury, Allstate is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### THIRD CAUSE OF ACTION

Against the Management Defendants, Grinberg, Braun, Mays and Spear

(Violation of RICO, 18 U.S.C. § 1962(d))

119.     Allstate incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 118 above.  Five Boro Psychological Services, P.C. is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affects interstate commerce.  Defendants Grinberg, Braun, Mays and Spear are employed by and/or associated with the Five Boro enterprise.  Defendants Grinberg, Braun, Mays and Spear knowingly have agreed, combined and conspired in the furtherance of the enterprise's affairs, through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent bills, on a continuous basis for almost seven years, seeking payment for psychology services that Five Boro I was not eligible to receive under  the

No-fault Laws because: (i) the billed-for services were not medically or psychologically necessary; (ii) the billed-for services were performed pursuant to a pre-determined fraudulent protocol designed solely to financially enrich the Defendants; (iii) the billed-for services were performed pursuant to kickbacks to the Clinics; (iv) the billed-for services in many cases were not performed at all; and (v) the billed for services in many cases were performed by independent contractors, rather than by Five Boro I employees.

120.     A representative sample of the fraudulent bills and corresponding mailings submitted to Allstate that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2." Each such mailing was made in furtherance of the mail fraud scheme.

121.     Grinberg, Braun, Mays and Spear knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud Allstate and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to Allstate.

122.     Allstate has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,600,000.00 dollars pursuant to the fraudulent bills submitted by the Defendants through Five Boro I.

123.     By reason of its injury, Allstate is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## FOURTH CAUSE OF ACTION

Against Five Boro I and the Management Defendants, Grinberg and Braun

(Common Law Fraud)

124.     Allstate incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 123 above.

40

125.    Defendants Five Boro I, Grinberg, and Braun intentionally and knowingly made false and fraudulent statements of material fact to Allstate and concealed material facts from Allstate in the course of their submission of thousands of fraudulent bills through Five Boro I seeking payment for psychological services.

126.    The false and fraudulent statements of material fact and acts of fraudulent concealment include:  (i) In every claim, the representation that Five Boro I is lawfully licensed and therefore eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(l) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact Five Boro I is not properly licensed in that it is a psychology professional corporation that unlawfully pays kickbacks to the Clinics for its patient referrals; (ii) In every claim, the representation that the pertinent psychological services actually are performed through Five Boro I, and that the pertinent psychological services are medically or psychologically necessary, when in fact the psychological services frequently are not performed at all and, to the extent that they are performed, are not medically or psychologically necessary and are performed pursuant to kickbacks that the PC/PLLC Defendants and the Management Defendants provide to the Clinics and pursuant to a pre-determined fraudulent protocol designed solely to financially enrich the Defendants; and (iii) In every claim for services provided by psychologists other than Braun, the representation that Five Boro I is eligible to receive No-fault Benefits pursuant to Insurance Law § 5102(a)(l) and 11 N.Y.C.R.R. § 65-3.11 for the services that are performed, although Five Boro I is not eligible to seek or pursue collection of No-fault benefits associated with services not provided by Braun because the services are not provided by Five Boro I's employees.

127.     The Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce Allstate to pay charges submitted through Five Boro I that were not compensable under the No-fault Laws.

128.     Allstate justifiably relied on the Defendants' false and fraudulent representations, and as a proximate result has been injured in its business and property by reason of the above- described conduct in that it has paid at least $1,600,000.00 pursuant to the fraudulent bills submitted by the Defendants through Five Boro I.

129.     The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Allstate to recover punitive damages.

130.     Accordingly, by virtue of the foregoing, Allstate is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## FIFTH CAUSE OF ACTION

Against Spear and Mays

(Aiding and Abetting Fraud)

131.     Allstate incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 130 above.

132.     Dougherty and Mays knowingly aided and abetted the fraudulent scheme that was perpetrated on Allstate by Five Boro I, Grinberg, and Braun. The acts of Spear and Mays in furtherance of the fraudulent scheme include: (i) knowingly performing medically unnecessary psychological services in exchange for payment of money from Five Boro I, Grinberg, and Braun; (ii) knowingly issuing fraudulent reports in exchange for payment of money from Five Boro, Grinberg, and Braun; and (iii) knowingly causing fraudulent billing to be issued in

exchange for payment in exchange for payment of money from Five Boro I, Grinberg, and Braun.

133.     The conduct of Spear and Mays in furtherance of the fraudulent scheme is significant and material. The conduct of Spear and Mays is a necessary part of and is critical to the success of the fraudulent scheme because without their actions, including the performance of the fraudulent psychological services, issuance of the fraudulent reports, and participation in the fraudulent billing, there would be no opportunity for Five Boro I, Grinberg, and Braun to obtain payment from Allstate and from other insurers.

134.     Spear and Mays aided and abetted the fraudulent scheme in a calculated effort to induce Allstate into paying charges to Five Boro I for medically unnecessary services or illusory services that were not compensable under New York's No-fault Laws, because they sought to continue profiting through the fraudulent scheme.

135.     The conduct of Spear and Mays caused Allstate to pay more than $1,600,000.00 based upon the fraudulent charges submitted through Five Boro I.

136.     The extensive fraudulent conduct of Dougherty and Mays demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Allstate to recover punitive damages.

137.     Accordingly, by virtue of the foregoing, Allstate is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## SIXTH CAUSE OF ACTION

Against Five Boro I, the Management Defendants, Grinberg, Braun, Spear and Mays

(Unjust Enrichment)

138.     Allstate incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 137 above.

139.     As set forth above, Five Boro I, the Management Defendants, Grinberg, Braun, Spear and Mays have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of Allstate.

140.     When Allstate paid the bills and charges submitted by or on behalf of Five Boro I for No-fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

141.     Five Boro I, the Management Defendants, Grinberg, Braun, Spear, and Mays have been enriched at Allstate's expense by Allstate's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

142.     Defendants' retention of Allstate's payments violates fundamental principles of justice, equity, and good conscience.

143.     By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $1,600,000.00.

## SEVENTH CAUSE OF ACTION

Against the Management Defendants, Grinberg and Braun

(Violation of RICO, 18 U.S.C. § 1962(c))

144.     Allstate incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 143 above.

145.     All Boro Psychological Services, P.C. is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affects interstate commerce.

146.     The Management Defendants, Grinberg and Braun have knowingly conducted and/or participated in All Boro's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341.  They have used the United States mails to submit, or cause to be submitted, thousands of fraudulent bills on a continuous basis for more than five years seeking payments that All Boro was not eligible to receive under the No-fault Laws because the billed-for services were not medically necessary, were performed and billed to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants, were performed pursuant to kickbacks provided to the Clinics, and in many cases were not performed at all. A representative sample of the fraudulent bills and corresponding mailings submitted to Allstate that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1."

147.     All Boro's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers.  The predicate acts of mail fraud are the regular way in which Grinberg and Braun operate All Boro, insofar as All Boro is not engaged in a legitimate psychological practice, and acts of mail fraud therefore are essential in

45

order for All Boro to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through All Boro to the present day.

148.     All Boro is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to Allstate and other insurers. These inherently unlawful acts are taken by All Boro in pursuit of inherently unlawful goals - namely, the theft of money from Allstate and other insurers through fraudulent No-fault billing.

149.     Allstate has been injured in its business and property by reason of the above-described conduct in that it has paid at least $464,000.00 pursuant to the fraudulent bills submitted by the Defendants through All Boro.

150.     By reason of its injury, Allstate is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## EIGHTH CAUSE OF ACTION

Against the Management Defendants, Grinberg, Braun, Dougherty,

Bonaparte, Mendelsohn, Margulis, Spear, Diamond, Cochrane and Mays

(Violation of RICO, 18 U.S.C. § 1962(d))

151.     Allstate incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 150 above.

152.     All Boro Psychological Services, P.C. is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affects interstate commerce.

153.     Grinberg, Braun, Dougherty, Bonaparte, Mendelsohn, Margulis, Spear, Diamond, Cochrane and Mays are employed by and/or associated with the All Boro enterprise.

154.     Grinberg, Braun, Dougherty, Bonaparte, Mendelsohn, Margulis, Spear, Diamond, Cochrane and Mays knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the All Boro enterprise's affairs, through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent bills, on a continuous basis for almost four years, seeking payment for psychology services that All Boro was not eligible to receive under the No-fault Laws because: (i) the  billed-for services were not medically- or psychologically-necessary; (ii) the billed-for services were performed pursuant to a pre-determined fraudulent protocol designed solely to financially enrich the Defendants; (iii) the billed-for services were performed pursuant to kickbacks to the Clinics; (iv) the billed-for services in many cases were not performed at all; and (v) the billed for services in many cases were performed by independent contractors, rather than by All  Boro  employees.  A representative sample of the fraudulent bills and corresponding identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1."  Each such mailing was made in furtherance of the mail fraud scheme.

155.     Grinberg, Braun, Dougherty, Bonaparte, Mendelsohn, Margulis, Spear, Diamond, Cochrane and Mays knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud Allstate and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to Allstate.

156.      Allstate has been injured in its business and property by reason of the above-described conduct in that it has paid at least $464,000 dollars pursuant to the fraudulent bills submitted by the Defendants through All Boro.

157.      By reason of its injury, Allstate is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## NINTH CAUSE OF ACTION

Against All Boro and the Management Defendants, Grinberg and Braun

(Common Law Fraud)

158.      Allstate incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 157 above.

159.      All Boro, the Management Defendants, Grinberg, and Braun intentionally and knowingly made false and fraudulent statements of material fact to Allstate and concealed material facts from Allstate in the course of their submission of thousands of fraudulent bills through All Boro seeking payment for psychological   services.

160.      The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) In every claim, the  representation that All Boro is lawfully licensed and therefore eligible to receive No-fault Benefits pursuant to Insurance Law 5102(a)(l) and 11 N.Y.C.R.R. § 65-3.16(a)(12) when in fact All Boro is not properly licensed in that it is a psychology professional corporation that unlawfully pays kickbacks to the Clinics for its patient referrals; (ii)  In every claim, the representation that the pertinent psychological services are actually performed through All Boro, and that the pertinent psychological services are medically

or psychologically necessary, when in fact the psychological services frequently are not performed at all and, to the extent that they are performed, they are not medically or psychologically necessary and are performed pursuant to kickbacks that the PC/PLLC Defendants and the Management Defendants provide to the Clinics and pursuant to a pre-determined fraudulent protocol designed solely to financially enrich the Defendants; and (iii) In every claim for services provided by psychologists other than Braun, the representation that All Boro is eligible to receive No-fault Benefits pursuant to Insurance Law§ 5102(a)(l) and 11 N.Y.C.R.R. § 65-3.11 for the services that are performed, when in fact All Boro is not eligible to seek or pursue collection of No-fault Benefits associated with services not alleged to have been provided by Braun because the services are not provided by All Boro' s employees.

161.    The Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce Allstate to pay charges submitted through All Boro that were not compensable under the No-fault Laws.

162.    Allstate justifiably relied on the Defendants' false and fraudulent representations, and as a proximate result has been injured in its business and property by reason of the above- described conduct in that it has paid at least $464,000.00 pursuant to the fraudulent bills submitted by the Defendants through All Boro.

163.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Allstate to recover punitive damages.

164.    Accordingly, by virtue of the foregoing, Allstate is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and

## TENTH CAUSE OF ACTION

Against Dougherty, Cochrane Bonaparte, Mendelsohn, Margulis, Spear, Diamond and Mays

(Aiding and Abetting Fraud)

165.    Allstate incorporates, as though fully set forth herein, each and every allegation in paragraphs l through 164 above.

166.    Dougherty, Cochrane, Bonaparte, Mendelsohn, Margulis, Spear, Diamond and Mays knowingly aided and abetted the fraudulent scheme that was perpetrated on Allstate by All Boro, Grinberg, and Braun.  The acts of  Dougherty, Cochrane, Bonaparte, Mendelsohn, Margulis, Spear, Diamond and Mays in furtherance of the fraudulent scheme include: (i) knowingly performing medically unnecessary psychological services in exchange for payment of money from All Boro, Grinberg, and Braun; (ii) knowingly issuing fraudulent reports in exchange for  payment of money from All Boro, Grinberg, and Braun; and (iii) knowingly causing fraudulent billing to be issued  in exchange for payment of money from All Boro, Grinberg, and Braun.

167.    The conduct of Dougherty, Cochrane, Bonaparte, Mendelsohn, Margulis, Spear, Diamond and Mays in furtherance of the fraudulent scheme is significant and material. The conduct of Dougherty, Cochrane, Bonaparte, Mendelsohn, Margulis, Spear, Diamond and Mays is a necessary part of and is critical to the success of the fraudulent scheme because without their actions, including the performance of the fraudulent psychological services, issuance of the fraudulent reports, and participation in the fraudulent billing, there would be no opportunity for All Boro, Grinberg, and Braun to obtain payment from Allstate and from other insurers.

168.     Dougherty, Cochrane, Bonaparte, Mendelsohn, Margulis, Spear, Diamond and Mays aided and abetted the fraudulent scheme in a calculated effort to induce Allstate into paying charges to All under New York's No-fault Laws, because they sought to continue profiting through the fraudulent scheme.

169.     The conduct of Dougherty, Cochrane, Bonaparte, Mendelsohn, Margulis, Spear, Diamond and Mays caused Allstate to pay more than $464,000.00 based upon the fraudulent charges submitted through All Boro.

170.     Dougherty's, Cochrane's, Bonaparte's, Mendelsohn's, Margulis's, Spear's, Diamond's and Mays's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Allstate to recover punitive damages.

171.     Accordingly, by virtue of the foregoing, Allstate is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## ELEVENTH CAUSE OF ACTION

Against All Boro, the Management Defendants, Grinberg, Braun, Dougherty, Cochrane, Bonaparte, Mendelsohn, Margulis, Spear, Diamond and Mays (Unjust Enrichment)

172.     Allstate incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 171 above.

173.     As set forth above, All Boro, the Management Defendants, Grinberg, Cochrane, Braun, Dougherty, Bonaparte, Mendelsohn, Margulis, Spear, Diamond and Mays have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of Allstate.

174.     When Allstate paid the bills and charges submitted by or on behalf of All Boro for No-fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

175.     All Boro, the Management Defendants, Grinberg, Braun, Dougherty, Cochrane, Bonaparte, Mendelsohn, Margulis, Spear, Diamond and Mays have been enriched at Allstate's expense by Allstate's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful and unjust billing scheme.

176.     Defendants' retention of Allstate's payments violates fundamental principles of justice, equity and good conscience.

177.     By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $464,000.00.

### TWELFTH CAUSE OF ACTION

Against the Management Defendants, Grinberg and Braun

(Violation of RICO, 18 U.S.C. § 1962(c))

178.     Allstate incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 177 above.

179.     Five Boro Psychological and Licensed Master Social Work Services P.L.L.C. is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4) that engages in activities which affects interstate commerce.

180.     The Management Defendants, Grinberg and Braun have knowingly conducted and/or participated in Five Boro II's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341.  They have used the

United States' mails to submit or cause to be submitted thousands of fraudulent bills on a continuous basis for more than three years seeking payments that Five Boro II was not eligible to receive under the No-fault Laws because the billed-for services were not medically necessary, were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants, were performed pursuant to kickbacks provided to the Clinics, and in many cases were not performed at all. A representative sample of the fraudulent bills and corresponding mailings submitted to Allstate that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2."

181.     Five Boro II's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers.  The predicate acts of mail fraud are the regular way in which the Management Defendants, Grinberg and Braun operate Five Boro II, insofar as Five Boro II is not engaged in a legitimate psychological practice, and acts of mail fraud therefore are essential in order for Five Boro II to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through Five Boro II to the present day.

182.     Five Boro II is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to Allstate and other insurers. These inherently unlawful acts are taken by Five Boro II in pursuit of inherently unlawful goals - namely, the theft of money from Allstate and other insurers through fraudulent No-fault billing.

183.    Allstate has been injured in its business and property by reason of the above-described conduct in that it has paid at least $300,000.00 pursuant to the fraudulent bills submitted by the Defendants through Five Boro II.

184.    By reason of its injury, Allstate is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## THIRTEENTH CAUSE OF ACTION

Against the Management Defendants, Grinberg, Braun, Dougherty, Bonaparte,

Mendelsohn, Margulis, Blacic, and Diamond

(Violation of RICO, 18 U.S.C. § 1962(d))

185.    Allstate incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 184 above.

186.    Five Boro Psychological and Licensed Master Social Work Services P.L.L.C. is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which  affects interstate commerce.  The Management Defendants, Grinberg, Braun, Dougherty, Bonaparte, Mendelsohn, Margulis, Blacic and Diamond are employed by and/or associated with the Five Boro enterprise. Dougherty, Bonaparte, Mendelsohn, Margulis, Blacic and Diamond knowingly have agreed, combined and conspired in the furtherance of the enterprise's affairs, through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent bills, on a continuous basis for almost seven years, seeking payment for psychology services that Five Boro Psychological was not eligible to receive under the No-fault Laws because: (i) the billed-for services were not

medically or psychologically necessary; (ii) the billed-for services were performed pursuant to a pre- determined fraudulent protocol designed solely to financially enrich the Defendants; (iii) the billed-for services were performed pursuant to kickbacks to the Clinics; (iv) the billed-for services in many cases were not performed at all; and (v) the billed for services in many cases were performed by independent contractors, rather than by Five Boro II employees.

187.    A representative sample of the fraudulent bills and corresponding mailings submitted to Allstate that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "3." Each such mailing was made in furtherance of the mail fraud scheme.

188.    Grinberg, Braun, Dougherty, Bonaparte, Mendelsohn, Margulis, Blacic and Diamond knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud Allstate and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to Allstate.

189.    Allstate has been injured in its business and property by reason of the above-described conduct in that it has paid at least $300,000 dollars pursuant to the fraudulent bills submitted by the Defendants through Five Boro II.

190.    By reason of its injury, Allstate is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## FOURTEENTH CAUSE OF ACTION

Against Five Boro II and the Management Defendants, Grinberg and Braun

(Common Law Fraud)

191.     Allstate incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 190 above.

192.     Five Boro II, Grinberg, and Braun intentionally and knowingly made false and fraudulent statements of material fact to Allstate and concealed material facts from Allstate in the course of their submission of thousands of fraudulent bills through Five Boro II seeking payment for psychological services.

193.     The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) In every claim, the representation that Five Boro II is lawfully licensed, and 5102(a)(l) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact Five Boro II is not properly licensed in that it is a psychology professional corporation that unlawfully pays kickbacks to the Clinics for its patient referrals.

194.     In every claim, the representation that the pertinent psychological  services actually are performed through Five Boro II, and that the  pertinent psychological services are medically or psychologically necessary,  when in fact the psychological services frequently are not performed at all and, to the extent that they are performed, they are not medically or psychologically necessary and are performed pursuant to kickbacks that the PC/PLLC Defendants and the Management Defendants provide to the Clinics and pursuant to a pre-determined fraudulent protocol designed solely to financially enrich the Defendants.

195.     In every claim for services provided by psychologists other than Braun, the representation that Five Boro II is eligible to receive No-fault Benefits pursuant to Insurance Law § 5102(a)(l) and 11 N .Y.C .R.R. § 65-3.11 for the services that are performed, when in fact Five Boro II is not eligible to seek or pursue collection of No-fault Benefits associated with services not alleged to have been provided by Braun because the services are not provided by Five Boro II's  employees.

196.     The Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce Allstate to pay charges submitted through Five Boro II that were not compensable under the No-fault Laws.

197.     Allstate justifiably relied on the Defendants' false and fraudulent representations, and as a proximate result has been injured in its business and property by reason of the above- described conduct in that it has paid at least $300,000.00 pursuant to the fraudulent bills submitted by the Defendants through Five Boro II.

198.     The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Allstate to recover punitive damages.

199.     Accordingly, by virtue of the foregoing, Allstate is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## FIFTEENTH CAUSE OF ACTION

Against Dougherty, Bonaparte, Mendelsohn, Margulis, Blacic, and Diamond

(Aiding and Abetting Fraud)

200.    Allstate incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 199 above.

201.    Dougherty, Bonaparte, Mendelsohn, Margulis, Blacic, and Diamond knowingly aided and abetted the fraudulent scheme that was perpetrated on Allstate by Five Boro II, Grinberg, and Braun. The acts of Do Dougherty, Bonaparte, Mendelsohn, Margulis, Blacic, and Diamond in furtherance of the fraudulent scheme include: (i) knowingly performing medically unnecessary psychological services in exchange for payment of money from Five Boro II, Grinberg, and Braun ; (ii) knowingly issuing fraudulent reports in exchange for payment of money from Five Boro II, Grinberg, and Braun; and (iii) knowingly causing fraudulent billing to be issued in exchange for payment of money from Five Boro II, Grinberg, and Braun.

202.    The conduct of Dougherty, Bonaparte, Mendelsohn, Margulis, Blacic, and Diamond in furtherance of the fraudulent scheme is significant and material.  The conduct of Dougherty, Bonaparte, Mendelsohn, Margulis, Blacic, and Diamond is a necessary part of and is critical to the success of the fraudulent scheme because without their actions, including the performance of the fraudulent psychological services, issuance of the fraudulent reports, and participation in the fraudulent billing, there would be no opportunity for Five Boro II, Grinberg, and Braun to obtain payment from Allstate and from other insurers.

203.     Dougherty, Bonaparte, Mendelsohn, Margulis, Blacic, and Diamond aided and abetted the fraudulent scheme in a calculated effort to induce Allstate into paying charges to Five under New York's No-fault Laws, because they sought to continue profiting through the fraudulent scheme.

204.     The conduct of Dougherty, Bonaparte, Mendelsohn, Margulis, Blacic, and Diamond caused Allstate to pay more than $300,000.00 based upon the fraudulent charges submitted through Five Boro II.

205.     Dougherty's, Bonaparte's, Mendelsohn's, Margulis's, Blacic's, and Diamond's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Allstate to recover punitive damages.

206.     Accordingly, by virtue of the foregoing, Allstate is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## SIXTEENTH CAUSE OF ACTION

Against Five Boro II, the Management Defendants, Dougherty, Bonaparte, Mendelsohn, Margulis, Blacic, and Diamond

(Unjust Enrichment)

207.      Allstate incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 206 above.

208.     As set forth above, Five Boro II, the Management Defendants, Grinberg, Braun, Dougherty, Bonaparte, Mendelsohn, Margulis, Blacic, and Diamond have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of Allstate.

209.     When Allstate paid the bills and charges submitted by or on behalf of Five Boro II for No-fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

210.      Five Boro II, the Management Defendants, Grinberg, Braun, Dougherty, Bonaparte, Mendelsohn, Margulis, Blacic, have been enriched at Allstate's expense by Allstate's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful and unjust billing scheme.

211.     Defendants' retention of Allstate's payments violates fundamental principles of justice, equity, and good conscience.

212.     By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $300,000.00.

### **JURY  DEMAND**

213.     Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury on all claims.

**WHEREFORE**, Plaintiffs, ALLSTATE INSURANCE COMPANY, ALLSTATE INDEMNITY COMPANY, ALLSTATE PROPERTY & CASUALTY INSURANCE, ALLSTATE NEW JERSEY INSURANCE COMPANY and ALLSTATE VEHICLE AND PROPERTY INSURANCE COMPANY (F/K/A DEERBROOK INSURANCE COMPANY), demand that a Judgment be entered in their favor:

A)      On the First Cause of Action, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that the PC/PLLC Defendants have no right to receive payment for any pending bills submitted to Allstate;

B)      On the Second Cause of Action against the Management Defendants, Grinberg and Braun, compensatory damages in favor of Allstate in an amount to be determined at trial but in excess of $1,600,000.00, together with treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § l964(c) plus interest;

C)      On the Third Cause of Action against the Management Defendants, Grinberg, Braun, Spear and Mays, compensatory damages in favor of Allstate in an amount to be determined at trial but in excess of $1,600,000.00, together with treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § l964(c) plus interest;

D)      On the Fourth Cause of Action against Five Boro I, the Management Defendants, Grinberg, and Braun, compensatory damages in favor of Allstate in an amount to be determined at trial but in excess of $1,600,000.00, together with punitive damages, costs and interest;

E)      On the Fifth Cause of Action against Spear and Mays, compensatory damages in favor of Allstate in an amount to be determined at trial but in excess of $1,600,000.00, together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

F)      On the Sixth Cause of Action against Five Boro I, the Management Defendants, Grinberg, Braun, Spear and Mays, more than $1,600,000.00 in compensatory damages, plus costs and interest, and such other and further relief as this Court deems just and proper;

61

G) On the Seventh Cause of Action against the Management Defendants, Grinberg and Braun, compensatory damages in favor of Allstate in an amount to be determined at trial but in excess of $464,000.00, together with treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § l 964(c) plus interest;

H) On the Eighth Cause of Action against Grinberg, Braun, Dougherty, Cochrane, Bonaparte, Mendelsohn, Margulis, Spear, Diamond and Mays, compensatory damages in favor of Allstate in an amount to be determined at trial but in excess of $464,000.00, together with treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

I) On the Ninth Cause of Action against All Boro, the Management Defendants, Grinberg, and Braun, compensatory damages in favor of Allstate in an amount to be determined at trial but in excess of $464,000.00 together with punitive damages, costs and interest;

J) On the Tenth Cause of Action against Dougherty, Cochrane, Bonaparte, Mendelsohn, to be determined at trial but in excess of $464,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

K) On the Eleventh Cause of Action against All Boro, the Management Defendants, Grinberg, Braun, Dougherty, Cochrane, Bonaparte, Mendelsohn , Margulis, Spear, Diamond, and Mays, more than $464,000.00 in compensatory damages, plus costs and interest, and such other and further relief as this Court deems just and proper;

L) On the Twelfth Cause of Action against the Management Defendants, Grinberg and Braun, compensatory damages in favor of Allstate an amount to be determined at trial but in

excess $300,000.00, of together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

M)     On the Thirteenth Cause of Action against the Management Defendants, Grinberg, Braun,  Dougherty, Bonaparte, Mendelsohn, Margulis, Blacic, and Diamond, compensatory damages in favor of Allstate an amount to be determined at trial but in excess of $300,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

N)     On the Fourteenth Cause of Action against Five Boro PLLC, the Management Defendants, Grinberg,  and Braun, compensatory damages in favor of Allstate in an amount to be determined at trial but in excess of $300,000.00, together with punitive damages, costs and interest;

O)     On the Fifteenth Cause of Action against Dougherty, Bonaparte, Mendelsohn, Margulis Blacic, and Diamond, compensatory damages in favor of Allstate in an amount to be determined at trial but in excess of $300,000.00, together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

P)     On the Sixteenth Cause of Action against Five Boro II, the Management Defendants, Grinberg, Braun, Dougherty, Bonaparte, Mendelsohn, Margulis, Blacic, and Diamond, more than $300,000.00 in compensatory damages, plus costs and interest, and such other and further relief as this Court deems just and proper; and

Q)      For such other and further relief as to the Court may seem just, proper, and

equitable.

Dated:  January 22, 2014
            New York, New York

ABRAMS, COHEN & ASSOCIATES

/s Barry S. Cohen

_____

Barry S. Cohen (BC 9825)
Frank Piccininni (FP 0776)
5 Hanover Square, Suite 1601
New York, New York 10004
(646) 449-7490
File No.:  FED-AB-001

Counsel for Plaintiffs,
ALLSTATE INSURANCE COMPANY,
ALLSTATE INDEMNITY COMPANY,
ALLSTATE PROPERTY & CASUALTY
INSURANCE COMPANY,
ALLSTATE NEW JERSEY INSURANCE
COMPANY and ALLSTATE VEHICLE &
PROPERTY INSURANCE COMPANY (F/K/A
DEERBROOK INSURANCE COMPANY)